HON._____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NAMECHEAP, INC., a Delaware corporation,<br><br>　　　　Plaintiff,<br>v.<br><br>TUCOWS, INC., a Pennsylvania corporation; ENOM, INC., a Nevada corporation; and DOES 1 through 10,<br><br>　　　　Defendants. | Case No. 2:17-cv-1310<br><br>COMPLAINT FOR:<br><br>1.　BREACH OF CONTRACT<br>2.　BREACH OF CONTRACT—SPECIFIC PERFORMANCE<br>3.　BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING<br>4.　UNJUST ENRICHMENT<br><br>DEMAND FOR JURY TRIAL |

　　　　Plaintiff Namecheap, Inc. ("**Plaintiff**" or "**Namecheap**"), by and through its undersigned attorneys, hereby complains against Defendant Tucows, Inc. ("**Tucows**"), Defendant eNom, Inc. ("**eNom**" and collectively with Tucows, "**Defendants**"), and defendants identified as Does 1 through 10 ("**Doe Defendants**") as follows:

## **NATURE OF THE ACTION**

　　　　1.　　Namecheap brings this action against eNom and its successor-in-interest, Tucows, to enforce a contractual obligation to transfer all Namecheap-managed domains on the eNom platform to Namecheap. A true and correct copy of the July 31, 2015 Master Agreement executed by Namecheap, on the one hand, and eNom and United TLD Holding Co., Ltd. *trading as* Rightside Registry ("**Rightside**"), on the other hand (the "**Master Agreement**") is attached as Exhibit A, with redactions to preserve confidentiality of information not relevant to this dispute.

COMPLAINT
CASE NO. _____ - 1

2.      Tucows acquired eNom from Rightside on or about January 20, 2017. Tucows knew of eNom's obligation to imminently transfer more than 4,000,000 domains to Namecheap and negotiated a reduced purchase price to account for their imminent transfer. Days after the acquisition, Tucows' CEO confirmed that Tucows stepped into eNom's shoes as its successor-in-interest and would honor its obligation under the Master Agreement to complete the transfer of the Namecheap-managed domains (specifically including by bulk transfer).

3.      As eNom's successor-in-interest, Tucows has a clear obligation to transfer the domains and "not obstruct, delay, deny, obfuscate or otherwise restrict" the transfer of Namecheap-managed domains. VeriSign has determined the VeriSign Domains are eligible for a transfer service known as Bulk Transfer After Partial Portfolio Acquisition ("**BTAPPA,**" a service described in greater detail below). Despite its obligations and VeriSign's determination, Tucows has refused to sign the paperwork necessary to execute the BTAPPA transfer of a number of .COM and .NET domains to Namecheap (hereafter the "**VeriSign Domains**"). Defendants have also breached their obligation to complete the bulk transfers of many other portfolios of Namecheap-managed domains acquired by Namecheap pursuant to the Master Agreement, specifically including approximately: 100,000 .info and .mobi domains via Afilias' own ICANN-approved version of the BTAPPA service for these TLDs; and 100,000 CentralNic TLDs, 40,000 Donuts TLDs, and 20,000 Uniregistry TLDs via the internal bulk transfer processes offered by the respective registries for these TLDs (collectively the "**Other Domains**"), despite Namecheap's repeated requests to implement those transfers and Defendants' repeated assurances of imminent compliance.

4.      Accordingly, Namecheap brings this action for breach of contract against Defendants to obtain compensation for the direct and consequential damages it has suffered and will continue to suffer as a direct and proximate result of Defendants' breach of their contractual obligation to complete the bulk transfers of the VeriSign and Other Domains; and equitable relief in the form of an order by this Court compelling Defendants' specific performance of their obligation under the Master Agreement to cooperate and sign the paperwork required for

COMPLAINT
CASE NO. _____ - 2

VeriSign and the other registry operators to implement the bulk transfers of the VeriSign and Other Domains. Such specific performance is both appropriate and necessary based on the unique nature of the property interests at issue, and the inadequacy of any legal remedy to compensate Namecheap for the harm it will suffer as a result of any further delay in onboarding the VeriSign and Other Domains to its own platform.

## **THE PARTIES**

5.     Namecheap is a corporation organized and existing under the laws of the state of Delaware, doing business and offering domain name registration and web-hosting services throughout the world. Namecheap maintains its principal office in Phoenix, Arizona and conducts business throughout the United States as well as internationally.

6.     Defendant Tucows, Inc. is a corporation organized and existing under the laws of the state of Pennsylvania, and based in Toronto, Ontario, Canada, that conducts business and provides domain registration and other internet services throughout the United States, Canada and Germany. Tucows is the successor-in-interest to eNom, which Tucows acquired from Rightside on or about January 20, 2017.

7.     Defendant eNom is a corporation organized and existing under the laws of the state of Nevada doing business and offering domain name registration, web-hosting, and other services. eNom maintains its principal place of business in Kirkland, Washington. eNom executed the Master Agreement at issue in this case.

8.     Doe Defendants 1 through 10 are individuals, partnerships or unincorporated business associations, the true names and capacities of which, whether individual, corporate, associate, partnership, limited liability company, or otherwise, are unknown to Namecheap. Namecheap therefore sues said Defendants by such fictitious names and will ask leave to amend this Complaint to show their true names and capacities when the same have been ascertained after discovery, which is necessary to ascertain the true names and capacities of these defendants.

9.     Namecheap alleges on information and belief that each of the fictitiously-named Defendants is responsible for the wrongful conduct herein alleged, and that such wrongful

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

conduct caused harm to Namecheap. At all material times, each of the Defendants was the agent, servant, employee, partner, joint venture, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the others, had full knowledge of, and gave substantial assistance to, the alleged activities, and, in doing the things alleged, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332. Plaintiff Namecheap, Inc. is a Delaware corporation with its headquarters based in Phoenix, Arizona, Defendant Tucows, Inc. is a Pennsylvania corporation with its headquarters based in Ontario, Canada, and Defendant eNom, Inc. is a Nevada corporation. Accordingly, complete diversity of citizenship exists among the parties to this action and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     This Court has jurisdiction over Defendants Does 1 through 10 pursuant to 28 U.S.C. § 1367.

12.     This Court also has personal jurisdiction over the parties because Namecheap and eNom agreed that Washington State law would govern the Master Agreement, consented to exclusive jurisdiction in the state and federal courts in King County, Washington, and expressly waived all defenses of lack of personal jurisdiction and *forum non conveniens* pursuant to the Master Agreement, and Defendant Tucows is equally bound by the terms of the Master Agreement as eNom's successor-in-interest.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Namecheap and eNom agreed to exclusive venue in the state and federal courts in King County, Washington, and Tucows is equally bound by the terms of the Master Agreement as eNom's successor-in-interest, and Defendant Tucows is not resident in the United States and may therefore be sued in any judicial district for purposes of venue.

//

COMPLAINT
CASE NO. _____ - 4

**FACTS COMMON TO ALL COUNTS**

14.     Namecheap, eNom, Rightside and Tucows are all Internet Corporation for Assigned Names and Numbers ("**ICANN**") accredited registrars providing domain name registration services to consumers throughout the United States and abroad.

**Overview of Domain Registries, Registrars and Resellers**

15.     A domain name *registrar* is an organization or commercial entity that manages the reservation of internet domain names for generic top level domain (gTLD) and/or country code top level domain (ccTLD) registries for which it has been accredited by ICANN.

16.     Domain registration information is maintained by the domain name *registries*, which contract with domain registrars to provide registration services to the public. An end user selects a registrar to provide the registration service, and that registrar becomes the designated registrar for the domain chosen by the user. The maximum period of registration for a domain name is ten (10) years before the registration must be renewed. Many domains are registered for just one or two-year periods pursuant to automatic renewal plans selected at signup.

17.     Only the designated registrar may modify or delete information about domain names in a central registry database. It is not unusual for an end-user to switch registrars, invoking a domain transfer between the registrars involved, as governed by specific domain name transfer policies and protocols.

18.     Many registrars offer registration through reseller affiliates, which are, in effect, third parties offering domain registration services through the registrar's accreditation. An end-user registers either directly with a registrar, or indirectly through one or more layers of resellers.

19.     In this case, Namecheap acted as a reseller for eNom for many years. As a reseller, Namecheap registered and managed millions of domains in various TLDs on the eNom platform under the Namecheap name, and has paid substantial fees to eNom in connection with the registration, transfer and renewal of those domains. Approximately 4,000,000 Namecheap-managed domains remain on the eNom platform.

//

COMPLAINT
CASE NO. _____ - 5

20.     The registries for different TLDs may have differing policies and requirements for implementing bulk transfers between registrars where one registrar that originally acted as the reseller for another registrar acquires the right to transfer sponsorship of domain name registrations from that registrar's credential to its own credential. Some registries (including for .COM, .NET, .BIZ, .NET, .INFO and .MOBI) offer the BTAPPA service, while other registries (such as in the case of the Rightside, CentralNic and Donuts TLDs discussed herein) offer such bulk transfer services under other names, such as a "filtered bulk transfer," subject to different requirements.

### Namecheap's Acquisition of the VeriSign Domains from eNom

21.     On or about July 31, 2015, Namecheap entered the Master Agreement with eNom and Rightside, the contents of which are confidential. The Master Agreement acknowledged the existing reseller relationship between Namecheap and eNom, and served to define other aspects of the parties' business relationship.

22.     In the Master Agreement, Namecheap agreed to exclusively use eNom's platform to register, transfer, and renew the VeriSign Domains (.COM, .NET), Afilias domains (.ORG), Rightside gTLDs, and all gTLDs on the Rightside Platform (including all Rightside gTLDs and all Donuts, Inc. gTLDs) (collectively, the "**Enumerated Domains**") for 14 months. In exchange for this period of exclusivity, Namecheap received the right to transfer the Enumerated Domains to its own platform on three-months' notice ("**Exclusivity Period**"). Master Agreement, §§ 3 (Exclusivity) and 7 (Transfer Agreement), Schedule A. The Enumerated Domains were the only Namecheap-managed domains subject to the Exclusivity Period, and the Master Agreement did not otherwise restrict Namecheap's right to transfer the other portfolios of Namecheap-managed domains from the eNom platform to Namecheap's own platform upon request.

23.     Pursuant to the Master Agreement, eNom agreed to "the transfer in any manner, bulk or otherwise, of the Namecheap-managed customer domain names residing on the eNom platform and/or registry credential" and to "not obstruct, delay, deny, obfuscate or otherwise restrict the transfer of the Namecheap-managed customer domains," "provided that any such

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

transfer complies with all applicable ICANN and registry rules, regulations and processes."

24.     Namecheap completed performance of its exclusivity obligations to eNom under the Master Agreement on December 31, 2016, when the Exclusivity Period came to an end for the Enumerated Domains (specifically including the VeriSign Domains) (the "**Closing**").

### Tucows' Liability as eNom's Successor-in-Interest

25.     Shortly after the Closing, Rightside notified Namecheap it was selling eNom to Tucows. Rightside advised Namecheap that, in connection with the sale, it had disclosed Namecheap's ownership of the transfer rights to the Namecheap-managed domains (specifically including the VeriSign Domains) to Tucows, and that Tucows understood its contractual obligation under the Master Agreement as eNom's successor-in-interest to complete bulk transfers of the Namecheap-managed domains (specifically including the VeriSign and Other Domains) to Namecheap upon request. However, Defendants did not obtain Namecheap's written consent to the assignment of the Master Agreement to Tucows as required under the terms of the Master Agreement.

26.     On information and belief, Tucows completed its acquisition of eNom on or about January 20, 2017.

27.     Immediately following the eNom acquisition, during a meeting with Namecheap's CEO, Richard Kirkendall, at the January 2017 NamesCon convention in Las Vegas, Tucows' CEO, Elliot Noss, confirmed Tucows' prior awareness of Namecheap's transfer rights under the Master Agreement, and told Mr. Kirkendall that Tucows had specifically accounted for the imminent loss of the Namecheap-managed domains (specifically including the Enumerated Domains) in negotiating the price for acquiring eNom.

28.     By its terms, the Master Agreement remains in effect through December 31, 2018, and is fully binding on the parties' successors and assigns. Thus, as eNom's successor-in-interest, Tucows stands in eNom's shoes and is equally subject to the terms of the Master Agreement, which remains in full force and effect. Among other things, that means that Tucows owes Namecheap a contractual duty under the Master Agreement to complete and "not obstruct, delay,

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

deny, obfuscate or otherwise restrict" the transfer of the VeriSign and Other Domains in the "manner, bulk or otherwise" designated by Namecheap.

29.     Defendants have already completed the bulk transfer of many Namecheap-managed domain portfolios to Namecheap consistent with their obligations under the Master Agreement using internal bulk transfer processes dictated by each particular registry, most recently including a December 1, 2016 transfer of approximately 100,000 .vegas domains (Afilias); and an April 27, 2017 transfer of approximately 31,000 Rightside TLDs in various extensions. eNom consented to the bulk transfer of the .vegas domains by sending an email to Afilias confirming its consent to the transfer. eNom consented to the transfer of the Rightside TLDs by signing a Registrar Acknowledgment and Waiver requesting Rightside to facilitate a "filtered bulk transfer at the registry level" to "chang[e] the sponsorship" of all the listed domains to Namecheap.

30.     Defendants also completed bulk transfers of approximately 400,000 .BIZ and .US domains (Neustar) to Namecheap using the BTAPPA service on or about January 12, 2017.

31.     Tucows admits that it is bound by the terms of the Master Agreement, and is obligated to complete the transfer of the VeriSign Domains to Namecheap, as eNom's successor-in-interest. However, Tucows has refused to complete the bulk transfer of the VeriSign Domains to Namecheap using the BTAPPA service based on the unmeritorious argument that doing so would violate ICANN/VeriSign rules, regulations and processes, and would therefore contravene the express language of Section 7 of the Master Agreement.

32.     Defendants have also breached their obligations to promptly complete the bulk transfers of the Other Domains to Namecheap according to the internal bulk transfer rules, regulations and processes in place for each of the applicable registries, despite Namecheap's repeated requests, Defendants' acknowledgement of their obligations under the Master Agreement, and Defendants' repeated assurances they would imminently honor their obligations by signing the paperwork necessary to implement the bulk transfers of the Other Domains.

//

COMPLAINT
CASE NO. _____ - 8

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

**VeriSign Has Already Approved the BTAPPA Service for the VeriSign Domains**

33.     Namecheap has determined that the BTAPPA service is the appropriate method for completing the transfer of the VeriSign Domains from eNom/Tucows to Namecheap, and has already confirmed with VeriSign that the transfer qualifies for the BTAPPA service.

34.     VeriSign obtained ICANN approval to offer VeriSign's BTAPPA service for the .COM and .NET registries via the Registry Request Service process on or about December 9, 2009. The BTAPPA service (as approved and agreed to by ICANN) is set forth in identical terms in Part 8.1 of Appendix 7 (Functional and Performance Specifications) to the .COM and renewed .NET Registry Agreements, dated December 1, 2012 (https://www.icann.org/resources/pages/appendix-07-2012-12-07-en) and July 1, 2017 (https://www.icann.org/sites/default/files/tlds/net/net-agmt-pdf-01jul17-en.pdf ) respectively.

35.     When VeriSign proposed adding BTAPPA as an additional registry service for the .COM and .NET registries to ICANN in July 2009, VeriSign explained the service as follows: "VeriSign will offer BTAPPA to all ICANN-registrars in the .com and .net top-level domains. In order to access the service, Gaining Registrars must submit a form to VeriSign's Customer Service team . . . VeriSign's (sic) will validate the registrar's identity, verify the contents of the submission and schedule the date for BTAPPA. VeriSign may request additional documentation or take additional steps it deems appropriate to ensure that all requirements are met with regard to Registrar Affiliate relationships." ICANN Registry Request Service BTAPPA Proposal for .COM and .NET (https://www.icann.org/en/system/files/files/verisign-btappa-request-29jul09-en.pdf).

36.     VeriSign further explained: "There is no ICANN policy or provision that currently addresses the business situation where only a portion of a Registrar's domain name portfolio is acquired. This service would facilitate the smooth transfer of a partial portfolio of domain names from one ICANN accredited registrar or recognized family of registrars to another ICANN accredited registrar." (*Id.*)

//

COMPLAINT
CASE NO. _____ - 9

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

37.     VeriSign's responsibility for determining the eligibility of a proposed bulk transfer for the BTAPPA service according to its own policies is also clear from the appendices to the Registry Agreements for these domains, which provide: "BTAPPA is a registry service available to consenting registrars in the circumstance where, pursuant to **VeriSign's policies**: (1) one ICANN-accredited registrar purchases (the "**Gaining Registrar**"), by means of a stock or asset purchase, merger or similar transaction, a portion, but not all, of another ICANN-accredited registrar's domain name portfolio (the "**Losing Registrar**") in the .COM/.NET top-level domain; or (2) a gaining registrar receives a request from a registrant to transfer a significant number of its domain names from a losing registrar to that gaining registrar." (Emphasis added.) Thus, VeriSign offers the BTAPPA service only in cases where it has already confirmed the existence of such a "Qualifying Event" by conducting a "pre-qualification" review.

38.     According to VeriSign's written guidelines for the BTAPPA service (the "**Guidelines**"), VeriSign considers several factors in determining if an event qualifies for the BTAPPA service, including, but not limited to, the following:

- Both registrars, losing and gaining, must be ICANN-accredited for the TLD and in good standing.
- Both registrars, losing and gaining, must consent to the domain names being transferred.
- A notice must be sent to all potentially impacted registrants notifying them of the pending change in sponsorship, and must be included with the Gaining Registrar's transfer request.

39.     According to the Guidelines, "if the Qualifying Event is an 'acquisition,' the Gaining Registrar must provide to VeriSign an affidavit signed by an authorized representative attesting to the nature of the acquisition, the closing date (which must be within the 12 months preceding the transfer request), and the fact that consideration was given." The Guidelines specifically note that, "such an affidavit must be provided in all acquisition transfer requests, including those involving a reseller of a registrar that becomes an accredited registrar and obtains the rights to transfer a partial domain name portfolio that it was previously managing as a

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

reseler."

40.     Where a Gaining Registrar believes that a transfer qualifies for the BTAPPA

service, the Guidelines instruct the Gaining Registrar to provide the following items for "pre-

qualification" review by VeriSign: (i) a proposed affidavit from Gaining Registrar's authorized

representative regarding the acquisition; (ii) a copy of the advance 30-days transfer notice to end-

users; (iii) a statement of the approximate number of domains to be transferred per TLD; and

(iv) a statement of the Gaining and Losing Registrar Name, GURID, contact name, title, address

and email information.

41.     Namecheap has already provided each of these items to VeriSign, and VeriSign

has already confirmed in writing that Namecheap's acquisition of the transfer rights for the

VeriSign Domains is a "Qualifying Event" for the BTAPPA service, which the Guidelines define

to include an "acquisition" (like the one presented here) "involving a reseller of a registrar . . .

that obtains the rights to transfer a partial domain name portfolio that it was previously managing

as a reseller" for "consideration"; and that the transfer of the Verisign Domains from

eNom/Tucows to Namecheap otherwise satisfies the Guidelines and qualifies for the BTAPPA

service.

42.     On or about July 21, 2017, VeriSign also expressly approved the 30-day notice to

registrants (the "**Notice**") prepared by Namecheap, and provided Namecheap with authorization

to execute the Notice to start the 30-day clock running on VeriSign's ability to implement the

transfer request.

**Tucows Refuses to Complete the Bulk Transfer of the VeriSign Domains**

43.     On or about July 27, 2017, Namecheap's attorneys informed Tucows that

VeriSign had approved the bulk transfer of the VeriSign Domains to Namecheap using the

BTAPPA service, and authorized Namecheap to execute the Notice to start the 30-day clock

running on VeriSign's ability to implement the transfer request. Namecheap requested that

Tucows perform its contractual obligation under the Master Agreement as eNom's successor-in-

interest to complete and "not obstruct, delay, deny, obfuscate or otherwise restrict the transfer"

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

by signing the BTAPPA transfer request, and confirming the accuracy of the list of VeriSign Domains subject to the transfer request for submission to VeriSign, as necessary for VeriSign to implement the BTAPPA service.

44.     On or about August 2, 2017, Tucows, via its attorneys, refused to comply with its obligation under the Master Agreement to sign the BTAPPA transfer request for the VeriSign Domains. Tucows based its refusal to comply on two purported grounds: first, that the transfer "would wreak such havoc and confusion" that there is no way that such transfer could "comply with all applicable ICANN and registry, rules, regulations and processes," as required under the Master Agreement; and second, that Tucows is unaware of any agreement by which Namecheap purchased any or all of the portfolio of domain names managed by eNom (sic) or any other entity" that would satisfy the Qualifying Event requirements for an "acquisition" under the BTAPPA Guidelines.

**Tucows Has No Valid Reason for Refusing to Complete the Transfer**

45.     Tucows appears to believe a BTAPPA transfer of the Verisign Domains would "wreak such havoc and confusion" because the Verisign Domains are "thin" registries. As explained by ICANN, "A thin registry only includes technical data sufficient to identify the sponsoring registrar, status of the registration, and creation and expiration dates for each registration in its WHOIS data store. .COM and .NET are examples of thin registries. Thick registries maintain the registrant's contact information and designated administrative and technical contact information, in addition to the sponsoring registrar and registration status information supplied by a thin registry. .INFO and .BIZ are examples of thick registries."

46.     Tucows argues that a BTAPPA transfer of thin registries like the VeriSign Domains present a data integrity issue because the registrant data for the Verisign Domains resides with eNom (as the registrar) rather than VeriSign (as the registry). Bulk transferring thin registries, Tucows contends, poses a greater risk that data may be lost during the migration between registries.

//

COMPLAINT
CASE NO. _____ - 12

47.     The issue Tucows raises is inherent in every bulk transfer of a thin registry and legally insufficient. Every BTAPPA transfer for .COM and .NET occurs on a "thin" registry and, yet, occurs without wreaking havoc and confusion. Regardless of any "havoc and confusion," the Verisign Domains qualify for BTAPPA under VeriSign's Guidelines and ICANN regulations, and Tucows may "not obstruct, delay, deny, obfuscate or otherwise restrict the transfer."

48.     Moreover, because Namecheap originated the entire customer portfolio for the VeriSign Domains, the complete customer information already resides with Namecheap. Thus, regardless of the fact that .COM and .NET are "thin" registries, a BTAPPA transfer does not pose any heightened risk of customer confusion or present any data integrity issue because Namecheap is the initial entry point for customer data and, therefore, it is the authoritative source of data, meaning that changes and information populated directly into the Namecheap interface immediately modify all Whois data for the Verisign Domains. As such, Defendants' objections are meritless and signal a deliberate effort to frustrate the terms of the Master Agreement and deny Namecheap the full benefit of the parties' agreement rather than present a legitimate issue encountered in effectuating the transfer. Indeed, the self-evident intent of the customers is to be with Namecheap, i.e. the company with which they initially signed up, rather than eNom's apparent successor, Tucows.

49.     Tucows' second ground for refusing to sign the BTAPPA transfer request for the VeriSign Domains is equally meritless. Tucows claims it is unaware of any purchase agreement between Namecheap and eNom whereby Namecheap acquired the transfer rights to the VeriSign Domains that would qualify as an "acquisition" for purposes of the BTAPPA service. To make this argument, Tucows urges a prohibitively narrow reading of the language contained in the .COM and .NET registry agreement appendices regarding the BTAPPA service, which describe a Qualifying Event "acquisition" as a situation where a gaining registrar "purchases . . . by means of a stock or asset purchase, merger or similar transaction, a portion, but not all," of a losing registrar's domain name portfolio.

//

COMPLAINT
CASE NO. _____ - 13

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

50.     Namecheap acquired the transfer rights to the VeriSign Domains via the Master Agreement in exchange for its promise of exclusivity for all new registrations, transfers and renewals of the Enumerated Domains. eNom already reaped the benefit of fourteen (14) months of exclusivity for all new registrations, transfers and renewals of the Enumerated Domains on the eNom platform as consideration for the transfer of the VeriSign Domains; and Tucows has already received an additional eight (8) months of exclusivity as an "extra" benefit in regard to the VeriSign Domains.

51.     The fact that Namecheap paid fourteen (14) months of "exclusivity" rather than cash to acquire the transfer rights to the VeriSign Domains does not alter the transaction's fundamental character as an "asset purchase." Again, Namecheap specifically bargained for the addition of the transfer agreement provision to the Master Agreement in exchange for the promise of exclusivity sought by eNom during the parties' negotiations of the Master Agreement. eNom explicitly acknowledged the quid-pro-quo nature of this arrangement during the parties' after-the-fact discussions regarding this same issue back in June 2016, when eNom affirmed that, upon the successful completion of Namecheap's exclusivity obligations to eNom, eNom would honor its end of the bargain by completing the transfer of the Enumerated Domains (specifically including all VeriSign Domains).

52.     This promise of exclusivity was very valuable to eNom, and has also proven very valuable to Tucows. Defendants receive a fee for every registration, renewal, and transfer of a Namecheap-managed domain on the eNom platform, and the majority of the approximately 4,000,000 Namecheap-managed domains that still reside on the eNom platform are renewed on an annual basis. Defendants also receive a significant percentage of the parking ad revenue while a domain is still active; and 100% of all post-expiry parking and auction revenue for Namecheap-managed domains that expire on the eNom platform. This all adds up to millions of dollars each year.

53.     VeriSign's own Guidelines for the BTAPPA service define a qualifying "acquisition" to include situations like the one presented here "involving a reseller of a registrar .

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

. . that obtains the rights to transfer a partial domain name portfolio that it was previously managing as a reseller." VeriSign has already confirmed in writing that Namecheap's acquisition of the transfer rights for the VeriSign Domains via the Master Agreement is a "Qualifying Event" for the BTAPPA service.

54.     Namecheap is informed and believes and based thereon alleges that ICANN and VeriSign intended the phrase "purchases . . . by means of a stock or asset purchase, merger or similar transaction"—as used in Part 8.1 of Appendix 7 to the .COM and .NET registry agreements—to refer broadly to any transaction whereby the Losing Registrar receives consideration from the Gaining Registrar for agreeing to transfer a portion, but not all, of the Losing Registrar's domain name portfolio to the Gaining Registrar; and not to exclude such an "acquisition" from qualifying for the BTAPPA service simply because the Gaining Registrar used creative financing rather than cash to purchase the domains.

55.     As VeriSign's July 2009 Registry Request Service BTAPPA Proposal to ICANN for .COM and .NET explains: "The service is designed to facilitate registrars conducting business through the acquisition and sale of partial portfolios of domain name registrations, which will support registrars current and ever changing business models." This language supports a broad interpretation of the "acquisition" requirements under BTAPPA's Guidelines.

56.     In short, an acquisition constitutes an "asset purchase" for purposes of the BTAPPA service as long as the Losing Registrar receives consideration from the Gaining Registrar for its acquisition of the transfer rights.

57.     Namecheap completed performance of its exclusivity obligations to eNom on December 31, 2016, thereby rendering full and final consideration for its acquisition of the transfer rights to the Enumerated Domains (specifically including the VeriSign Domains).

58.     Given these facts, Defendants have already received millions of dollars' worth of consideration in exchange for Namecheap's acquisition of the transfer rights to the VeriSign Domains and other Enumerated Domains, and Namecheap's acquisition of those rights constitutes an "asset purchase" for purposes of the BTAPPA service.

COMPLAINT
CASE NO. _____ - 15

59.     VeriSign has already considered these facts and determined that Namecheap's "acquisition" of the VeriSign Domains is a Qualifying Event for purposes of the BTAPPA service.

60.     As a result, Defendants have no legitimate basis for refusing to sign the BTAPPA transfer request and agreement necessary for VeriSign to implement the BTAPPA service and complete the bulk transfer of the VeriSign Domains to Namecheap. Defendants' refusal to complete the bulk transfer of the VeriSign Domains via the BTAPPA service therefore amounts to a breach of Defendants' contractual obligations to Namecheap under the Master Agreement to complete and "not obstruct, delay, deny, obfuscate or otherwise restrict the transfer."

61.     On August 15, 2017, in a further effort to resolve this dispute informally and procure Tucows' voluntary compliance with its obligations, Namecheap's representatives again addressed to Tucows' representatives an explanation of Tucows' respective obligations under the Master Agreement and the dearth of merit in its articulated objections to the BTAPPA request. Further, Namecheap offered to pay additional consideration in the form of a cash payment and execute a separate purchase agreement with Tucows that would place the "acquisition" squarely within Tucows' own prohibitively narrow interpretation of the "asset purchase" requirement language contained in the .COM and .NET registry agreements, and thereby obviate any further basis for disagreement about whether the VeriSign Domains transfer qualifies for the BTAPPA service. Tucows rejected this proposal out of hand, thereby leaving Namecheap with no option other than to file this action to seek redress for Defendants' unjustified refusal to comply with their contractual obligations.

## COUNT I

## BREACH OF CONTRACT

62.     Namecheap restates and hereby incorporates the allegations contained in paragraphs 1 through 61, inclusive, as though set forth in full.

63.     Namecheap entered the Master Agreement with eNom and Rightside on or about July 31, 2015.

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

64.     Pursuant to the Master Agreement, Namecheap acquired the right to transfer all Namecheap-managed top level domains residing on the eNom platform from eNom to Namecheap. In consideration for eNom's covenant to "transfer in any manner, bulk or otherwise, the Namecheap-managed customer domain names residing on the eNom platform," Namecheap agreed that all new registrations, transfers and renewals for the Enumerated Domains (specifically including the VeriSign Domains) would occur exclusively on the eNom platform through December 31, 2016.

65.     Namecheap specifically bargained for the addition of the transfer agreement provision to the Master Agreement in exchange for the promise of exclusivity sought by eNom during the parties' negotiations. eNom explicitly acknowledged the quid-pro-quo nature of this arrangement during the parties' after-the-fact discussions regarding this same issue back in June 2016 when eNom affirmed that, upon the successful completion of Namecheap's exclusivity obligations to eNom, eNom would honor its end of the bargain by completing the transfer of the Enumerated Domains (specifically including the VeriSign Domains), and all other Namecheap-managed domains remaining on the eNom platform.

66.     Namecheap completed performance of its exclusivity obligations to eNom on December 31, 2016, thereby rendering full and final consideration for its acquisition of the transfer rights in the VeriSign Domains. Thus, Namecheap specifically bargained for its acquisition of these transfer rights, and eNom received fourteen (14) months of exclusivity for all new registrations, transfers and renewals of the Enumerated Domains as direct consideration for Namecheap's acquisition of those transfer rights.

67.     Pursuant to its express terms, the Master Agreement is fully binding on eNom and eNom's successors and assigns, and remains in effect through December 31, 2018. Tucows' CEO, Elliot Noss, confirmed Defendants' obligations under the Master Agreement to complete the bulk transfers of the Enumerated Domains (specifically including the VeriSign Domains), and all other Namecheap-managed domains remaining on the eNom platform, during a meeting with Namecheap's CEO, Richard Kirkendall, at the January 2017 NamesCon Convention in Las

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

Vegas, just days after Tucows completed its acquisition of eNom.

68.     Thus, as eNom's successor-in-interest, Tucows stands in eNom's shoes and is equally subject to the terms of the Master Agreement, which remains in full force and effect. That means that Tucows also owes Namecheap a contractual duty under the Master Agreement to "not obstruct, delay, deny, obfuscate or otherwise restrict," and to complete the transfer of the VeriSign Domains and Other Domains in the "manner, bulk or otherwise," designated by Namecheap. Tucows does not dispute its obligation as eNom's successor in interest to complete the transfer of the VeriSign Domains to Namecheap, but merely disputes its obligation to complete a *bulk* transfer of the VeriSign Domains using the BTAPPA service.

69.     Namecheap's right to effectuate bulk transfers of the VeriSign Domains and the rest of the Namecheap-managed domains from the eNom platform to the Namecheap platform is extremely valuable to Namecheap for a number of reasons. From a strictly financial perspective, effectuating bulk transfers of the VeriSign Domains and Other Domains means Namecheap will save millions of dollars in registration, renewal, transfer and parking revenues that would otherwise go to eNom/Tucows for so long as those domains remain on the eNom platform. Namecheap will also retain 100% of the post-expiry parking and auction revenues (that would otherwise go to eNom/Tucows) for VeriSign Domains and Other Domains that expire once they are on the Namecheap platform.

70.     From a strategic perspective, effectuating bulk transfers of the VeriSign Domains and Other Domains to the Namecheap platform will directly and materially impact Namecheap's valuation and market position, along with its ability to procure investor funds and financing, and make deals with strategic partners. Having the VeriSign Domains and Other Domains directly under management on Namecheap's own platform rather than having them under management on eNom's platform as a reseller will dramatically increase Namecheap's valuation as a company and position in the marketplace. Thus, the ability to transfer the VeriSign Domains and Other Domains in bulk immediately (rather than doing so over time as Defendants have proposed in regard to the VeriSign Domains) has significant economic and strategic value to Namecheap.

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

A significant part of that value is simply not quantifiable in terms of dollars, and cannot be compensated by legal damages.

71.     In reasonable and foreseeable reliance on its transfer rights under the Master Agreement, Namecheap devoted considerable resources to staffing and training a dedicated team for completing bulk transfers of the millions of Namecheap-managed domains (specifically including the VeriSign Domains and Other Domains) still residing on the eNom platform at the time of eNom's acquisition by Tucows in January 2017. As a direct and immediately foreseeable consequence of Defendants' refusal to complete the bulk transfer of the VeriSign Domains to Namecheap via the BTAPPA service, and their continuing failure to complete the requested bulk transfers of the Other Domains, Namecheap has suffered and will continue to suffer an ongoing drain of resources from the resulting inability of Namecheap's dedicated bulk transfer team to perform the work for which it was created absent Defendants' good faith cooperation in those efforts.

72.     Defendants' continuing refusal to complete the requested BTAPPA transfer of the VeriSign Domains, and continuing failure to complete the requested bulk transfers of the Other Domains, to the Namecheap platform has negatively impacted and continues to negatively impact the Namecheap customer experience due to the unreliability and wonkiness of eNom's systems and platform, thereby injuring Namecheap's goodwill among its customers, and simultaneously benefiting eNom/Tucows as Namecheap's direct competitors.

73.     Defendants' proposal to transfer the VeriSign Domains to Namecheap at the time of renewal, or transfer the VeriSign Domains to a Namecheap credential on the eNom platform, will not alleviate any of these harms, and would also cause Namecheap to suffer substantial additional harm, financially, reputationally and strategically.

74.     Defendants have no proper excuse, basis or justification for refusing and otherwise failing to perform their obligations under the Master Agreement to complete the requested bulk transfers of the VeriSign Domains and Other Domains to Namecheap.

//

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

75.     Defendants' continuing refusal and failure to complete the requested bulk transfers of the VeriSign Domains and Other Domains to Namecheap constitutes a material breach of Defendants' duty under the Master Agreement to complete and "not obstruct, delay, deny, obfuscate or otherwise restrict" the transfer of the Namecheap-managed domains to Namecheap in any "manner, bulk or otherwise."

76.     Defendants' breach of their stated duties under the Master Agreement as well as their obligations implied by operation of law have caused, and continue to cause, Namecheap to suffer direct damages, consequential damages, and other legal damages as described above, in an amount to be proved at trial.

## COUNT II

## BREACH OF CONTRACT—SPECIFIC PERFORMANCE

77.     Namecheap hereby incorporates the allegations contained in paragraphs 1 through 76, inclusive, as though set forth in full.

78.     A valid contract exists. Namecheap entered the Master Agreement with eNom and Rightside on or about July 31, 2015.

79.     Pursuant to the Master Agreement, Namecheap acquired the right to transfer all Namecheap-managed top level domains residing on the eNom platform from eNom to Namecheap. In consideration for eNom's covenant to "transfer in any manner, bulk or otherwise, the Namecheap-managed customer domain names residing on the eNom platform," Namecheap agreed that all new registrations, transfers and renewals of the Enumerated Domains (specifically including the VeriSign Domains) would occur exclusively on the eNom platform through December 31, 2016.

80.     The terms of the contract are clear. Namecheap specifically bargained for the addition of the transfer agreement provision to the Master Agreement in exchange for the promise of exclusivity sought by eNom during the parties' negotiations. eNom explicitly acknowledged the quid-pro-quo nature of this arrangement during the parties' after-the-fact discussions regarding this same issue back in June 2016 when eNom affirmed that, upon the

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

successful completion of Namecheap's exclusivity obligations to eNom, eNom would honor its end of the bargain by completing the transfer of the Enumerated Domains (specifically including the VeriSign Domains), and all other Namecheap-managed domains still remaining on the eNom platform. Thus, the parties to the Master Agreement specifically agreed to the adequacy of the consideration for eNom's promise to complete the transfer of the VeriSign Domains and Other Domains in any manner, bulk or otherwise, and the just and reasonable nature of the contract's terms. Moreover, Defendants' obligation to implement bulk transfers of the VeriSign Domains and Other Domains to Namecheap is clearly ascertainable under the parties' Master Agreement.

81.      Namecheap completed performance of its exclusivity obligations to eNom on December 31, 2016, thereby rendering full and final consideration for its acquisition of the transfer rights in the VeriSign Domains. Thus, Namecheap specifically bargained for its acquisition of these transfer rights and eNom received fourteen (14) months of exclusivity for all new registrations, transfers and renewals of the Enumerated Domains (specifically including the VeriSign Domains) as direct consideration for Namecheap's acquisition of those transfer rights.

82.      Pursuant to its express terms, the Master Agreement is fully binding on eNom and eNom's successors and assigns, and remains in effect through December 31, 2018. Tucows' CEO, Elliot Noss, confirmed Defendants' obligations under the Master Agreement to complete the bulk transfers of the Enumerated Domains (specifically including the VeriSign Domains), and all other Namecheap-managed domains remaining on the eNom platform, during a meeting with Namecheap's CEO, Richard Kirkendall, at the January 2017 NamesCon Convention in Las Vegas, just days after Tucows completed its acquisition of eNom.

83.      Thus, as eNom's successor-in-interest, Tucows stands in eNom's shoes and is equally subject to the terms of the Master Agreement, which remains in full force and effect. That means that Tucows also owes Namecheap a contractual duty under the Master Agreement to "not obstruct, delay, deny, obfuscate or otherwise restrict," and to complete the transfer of the VeriSign Domains and Other Domains in the "manner, bulk or otherwise," designated by Namecheap.

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

84.     Tucows has breached its obligations under the Master Agreement. Tucows does not dispute its obligation as eNom's successor in interest to complete the transfer of the VeriSign Domains to Namecheap, but refuses to transfer the VeriSign Domains using the BTAPPA service as the Master Agreement requires.

85.     Specific performance is appropriate because there is no adequate remedy at law. Namecheap's right to effectuate bulk transfers of the VeriSign Domains and the rest of the Namecheap-managed domains from the eNom platform to the Namecheap platform is extremely valuable to Namecheap for a number of reasons. From a strictly financial perspective, effectuating bulk transfers of the VeriSign Domains and Other Domains means Namecheap will save millions of dollars in registration, renewal, transfer and parking revenues that would otherwise go to eNom/Tucows for so long as those domains remain on the eNom platform. Namecheap will also retain 100% of the post-expiry parking and auction revenues (that would otherwise go to eNom/Tucows) for VeriSign Domains and Other Domains that expire once they are on the Namecheap platform.

86.     From a strategic perspective, effectuating bulk transfers of the VeriSign Domains and Other Domains to the Namecheap platform will directly and materially impact Namecheap's valuation and market position, along with its ability to procure investor funds and financing, and make deals with strategic partners. Having the VeriSign Domains and Other Domains directly under management on Namecheap's own platform rather than having them under management on eNom's platform as a reseller will dramatically increase Namecheap's valuation as a company and market position. Thus, the ability to transfer the VeriSign Domains and Other Domains in bulk immediately (rather than doing so over time as Defendants have proposed in regard to the VeriSign Domains) has significant economic and strategic value to Namecheap. A significant part of that value is simply not quantifiable in terms of dollars, and cannot be compensated by legal damages.

87.     In reasonable and foreseeable reliance on its transfer rights under the Master Agreement, Namecheap devoted considerable resources to staffing and training a dedicated team

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

for completing bulk transfers of the millions of Namecheap-managed domains (specifically including the VeriSign Domains and Other Domains) still residing on the eNom platform at the time of eNom's acquisition by Tucows in January 2017. As a direct and predictable consequence of Defendants' refusal to complete the bulk transfer of the VeriSign Domains to Namecheap via the BTAPPA service, and their continuing failure to complete the requested bulk transfers of the Other Domains, Namecheap has suffered and will continue to suffer an ongoing drain of resources from the resulting inability of Namecheap's dedicated bulk transfer team to perform the work for which it was created absent Defendants' good faith cooperation in those efforts.

88.    Defendants' continuing refusal and failure to complete the requested bulk transfers of the VeriSign Domains and Other Domains to the Namecheap platform has negatively impacted and continues to negatively impact the Namecheap customer experience due to the unreliability and wonkiness of eNom's systems and platform, thereby injuring Namecheap's goodwill among its customers, and simultaneously benefiting eNom/Tucows as Namecheap's direct competitors.

89.    Defendants' proposal to transfer the VeriSign Domains to Namecheap at the time of renewal, or transfer the VeriSign Domains to a Namecheap credential on the eNom platform, will not alleviate any of these harms, and would also cause Namecheap to suffer substantial additional harm, financially, reputationally and strategically.

90.    Defendants have no proper excuse, basis or justification for refusing and otherwise failing to perform their obligations under the Master Agreement to complete the requested bulk transfers of the VeriSign Domains and Other Domains to Namecheap.

91.    Defendants' continuing refusal and failure to complete the requested bulk transfers of the VeriSign Domains and Other Domains to Namecheap constitutes a material breach of Defendants' duty under the Master Agreement as eNom's successor-in-interest to complete and "not obstruct, delay, deny, obfuscate or otherwise restrict" the transfer of the Namecheap-managed domains to Namecheap in any "manner, bulk or otherwise."

92.    Defendants' breach of their stated duties under the Master Agreement as well as

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

their obligations implied by operation of law have caused, and continue to cause, Namecheap to suffer direct damages, consequential damages, and other legal damages as described above, in an amount to be proved at trial.

93.     Namecheap's remedy at law for Defendants' breach is inadequate because the VeriSign Domains and Other Domains constitute unique property that Namecheap has already purchased but may not possess absent Defendants' cooperation in the transfer process and legal damages alone are inadequate to compensate Namecheap for the harm it will suffer as a result of any further delay in onboarding the VeriSign Domains and Other Domains to its own platform due to Defendants' continuing breach of their obligations to complete the bulk transfers of these domains.

94.     A decree of specific performance requiring Defendants to comply with their contractual obligation to transfer the VeriSign Domains and Other Domains to Namecheap as agreed would not require court supervision or otherwise impose burdens on judicial resources.

## COUNT III

### BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

95.     Namecheap hereby incorporates the allegations contained in paragraphs 1 through 93, inclusive, as though set forth in full.

96.     Under Washington law, applicable pursuant to the parties' agreement, an implied duty of good faith and fair dealing exists in all agreements that requires the parties to cooperate with each other so that each party may obtain the full benefit of performance.

97.     The duty of good faith and fair dealing required Defendants to perform in good faith the obligations they agreed to perform in the Master Agreement, namely, the obligation to transfer the VeriSign Domains and Other Domains to Namecheap. The duty of good faith and fair dealing further required Defendants to cooperate with Namecheap, in a timely fashion, in preparing, approving and signing the necessary documentation and complying with the procedures necessary to complete the bulk transfers of the VeriSign Domains and Other Domains to Namecheap.

COMPLAINT
CASE NO. _____ - 24

98.     By breaching these obligations of good faith and fair dealing, Defendants unfairly, deceptively or with improper motive, interfered with Namecheap's right to receive the full benefits of the Master Agreement. Further, Tucows' refusal to sign a document that would resolve its claims of ICANN non-compliance and continued refusal to cooperate in effectuating a BTAPPA transfer of the VeriSign Domains constitutes a breach of the covenant of good faith and fair dealing implied in the Master Agreement. Tucows' refusal to perform its obligations under the Master Agreement to complete the transfer of the VeriSign Domains via the BTAPPA service is not an isolated incident, but appears to be part of a pattern and practice of bad faith conduct, as evidenced by Defendants' unjustifiable delays in completing the requested bulk transfers of the Other Domains, thereby further discrediting Tucows' position in this matter.

99.     As a proximate result of Defendants' material breaches, Namecheap has been injured and suffered damages in an amount to be proven at trial.

## COUNT IV

### UNJUST ENRICHMENT

100.     Namecheap hereby incorporates the allegations contained in paragraphs 1 through 98, inclusive, as though set forth in full.

101.     Namecheap conferred a benefit upon Defendants, specifically, Namecheap's performance of its promise of exclusivity in return for Defendants' agreement to transfer the VeriSign Domains and Other Domains to Namecheap. Defendants have been unjustly enriched by retaining the VeriSign Domains and Other Domains on the eNom platform after the expiration of the Exclusivity Period and Namecheap's request for the implementation of the bulk transfers for these domains.

102.     Defendants have appreciation and knowledge of such benefit and have accepted and retained the benefit at Namecheap's expense.

103.     The circumstances are such that it would be inequitable for Defendants to retain the benefit without the payment of its value. As a consequence, Namecheap is entitled to recovery and restitution of the benefit unjustly retained by Defendants.

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Namecheap, Inc. prays for judgment as follows:

(a)     For direct and consequential damages Namecheap suffered as a result of Defendants' breach of their duty under the Master Agreement to complete the bulk transfer of the VeriSign Domains and Other Domains to Namecheap;

(b)     For an order for injunctive relief from this Court compelling eNom and Tucows (including their officers, partners, agents, servants, employees, parents, subsidiaries, related companies, successors, predecessors, assigns and attorneys, and all others in active concert or participation with any of them) to specifically perform their contractual duty to sign the paperwork (and perform any related actions) necessary for VeriSign to implement the BTAPPA service and complete the transfer of the VeriSign Domains from eNom/Tucows to Namecheap;

(c)     For an order for injunctive relief from this Court compelling eNom and Tucows (including their officers, partners, agents, servants, employees, parents, subsidiaries, related companies, successors, predecessors, assigns and attorneys, and all others in active concert or participation with any of them) to specifically perform their contractual duty to sign the paperwork (and perform any other related actions) necessary for the respective registries to implement the bulk transfer of the Other Domains from eNom/Tucows to Namecheap according to each registry's own respective policies and processes for the bulk transfer of domains between registrars; and

(d)     For such other and further relief as the Court deems just and proper.

DATED: August 30, 2017                    Respectfully submitted,
                                          ROME & ASSOCIATES

                                          By: s/ Eugene Rome
                                          Eugene Rome, Cal. State Bar. No. 232780
                                          (pro hac vice submitted)
                                          2029 Century Park Easy, Ste. 450
                                          Los Angeles, CA 90067
                                          Tel: (310) 282-0690
                                          Fax: (310) 282-0691
                                          erome@romeandsociates.com

**focal** PLLC
900 1st Avenue S., Suite 201
Seattle, WA 98134
Tel (206) 529-4827
Fax (206) 260-3966

FOCAL PLLC

By: *s/ Venkat Balasubramani*
    Venkat Balasubramani, WSBA No. 28269
    *s/ Garrett Heilman*
    Garrett Heilman, WSBA No. 48415
    900 1st Avenue S., Suite 201
    Seattle, WA 98134
    Tel: (206) 529-4827
    Fax: (206) 260-3966
    venkat@focallaw.com
    garrett@focallaw.com
    *Attorneys for Plaintiff*

COMPLAINT
CASE NO. _____ - 27